IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

_____

CHRISTIAN LEGAL SOCIETY;
CHRISTIAN LEGAL SOCIETY
CHAPTER AT THE UNIVERSITY OF
MONTANA SCHOOL OF LAW, a
student organization at the
University of Montana School
of Law, on behalf of itself
and its individual members,

                           CV 07-154-RFC-JCL

               Plaintiffs,

     vs.

                           FINDINGS & RECOMMENDATION
                           OF UNITED STATES
                           MAGISTRATE JUDGE

E. EDWIN ECK, in his official
capacity as Dean of the
University of Montana School of
Law; MARGARET A. TONON, in her
official capacity as Director
for Student Affairs; and The
Members of the Executive Board
of the Student Bar Association of
the University of Montana School
of Law,

               Defendants.

_____

    At issue in this First Amendment case is the tension between
a public law school's interest in enforcing its non-
discrimination policies and a religious student group's interest
in exercising its constitutional rights of free speech,

association, and religious exercise.  Pending before the Court are Defendants' motion to dismiss and Plaintiffs' cross-motion for summary judgment.

## I.   Background

The University of Montana School of Law is a public law school located in Missoula, Montana and is part of the University of Montana system.  Joint Stip. ¶ 13, 16.  All students enrolled in the School of Law automatically become members of the Student Bar Association (SBA) and pay mandatory student activity fees. Compl. (Dec. 14, 2007) Ex. D; Pl.'s State. Undisputed Facts ¶ 25 (July 28, 2008).  The SBA is the exclusive official governing organization representing the students enrolled in the School of Law, and is itself governed by the SBA Executive Board.  Compl. Ex. D.  The School of Law allows its students to form organizations, and the SBA "retains the power to recognize and support independent organizations and associations of students in the School of Law and to allocate SBA funds for the use of such recognized groups." Joint Stip. ¶ 14; Compl. Ex. D.

In the summer of 2007, the Christian Legal Society Chapter at the University of Montana School of Law (CLS-UM) began seeking recognition as a student organization by the SBA.  Joint Stip. ¶ 16.  CLS-UM is a local law student chapter of a nationwide association of Christian legal professionals known as the Christian Legal Society (CLS).  Pls.' State. Undisputed Facts

(July 28, 2008) ¶ 1.  CLS-UM's stated mission "is to maintain a vibrant Christian law student fellowship on the School's campus which enables its members, individually and as a group, to love the Lord with their whole beings - hearts, souls, and minds - and to love their neighbors as themselves."  Compl. (Dec. 14, 2007), Ex. B.

While CLS-UM meetings and other activities are open to any student, regardless of race, religion, "sexual attractions or practices, or membership or non-membership in any other protected class," a student who wishes to become a member or officer must sign and affirm CLS's Statement of Faith.  Joint Stip. of Non-Dispositive Facts ¶ 10 (May 7, 2008).  CLS specifically requires that its members affirm the Statement of Faith as interpreted by its "board of directors' Resolution on the Statement of Faith and Sexual Morality Standards."  Compl. Ex. B.  According to that resolution, "[t]he Holy Scripture declares that the 'acts of the sinful nature' of which the repentant believer is forgiven and from which he or she is to be cleansed include all acts of sexual conduct outside of God's design for marriage between one man and one woman, which acts include fornication, adultery, and homosexual conduct."  Compl. Ex. C.  "In view of those clear dictates of Scripture," the resolution states that "unrepentant participation in or advocacy of a sexually immoral lifestyle is inconsistent with an affirmation of the Statement of Faith, and

consequently may be regarded by CLS as disqualifying such an individual from CLS membership."  Compl. Ex. C.

The SBA's bylaws contain an open-membership provision, pursuant to which a student group must be "open to all members of the School of Law" in order to be recognized by the SBA as an "independent student organization eligible to receive SBA funds." Compl. Ex. D, p. 11 (SBA Bylaws art. X, § 2).  This provision is to be read in conjunction with the SBA bylaws' non-discrimination provision, which states that "[s]tudents have the right to be free from discrimination, harassment, or intimidation based upon actual or perceived: age, sex, nationality, creed, religion, color, race, sexual orientation, gender identity and expression, disability, familial status, military service, or other purely arbitrary criteria."  Compl. Ex. D, p. 4 (SBA Bylaws art. IV, § 10); Pls.' S.U.F. ¶ 37.

The funding allocation process at the School of Law begins each year with a call from the SBA's Business Manager "for budget requests from independent student organizations."  Compl. Ex. D, p. 11 (SBA Bylaws art. X, § 4).  The Business Manager then submits a budget proposal to the SBA Executive Board, which in turn convenes a budget hearing "to hear all independent student organization comments regarding the SBA Budget Recommendations." Compl. Ex. D, p. 11-12.

In accordance with these procedures, the SBA Business Manager submitted a report to the Executive Board on September 9,

2007, recommending allocations of funds based in part on her opinions as to the popularity of student organizations' past events, the anticipated popularity of student organizations' future events, and whether their events benefitted the entire student body or only a few students.  Joint. Stip. ¶ 34.  The SBA Executive Board convened a budget hearing on September 19, 2007, for purposes of discussing, among other things, funding allocations for student organizations during the 2007-2008 academic year.  Joint Stip. ¶ 18.  The SBA Executive Board voted at that meeting to include CLS-UM in the final budget proposal, and on September 20, 2007, presented that proposed budget to the student body for a ratification vote.  Joint Stip. ¶¶ 18-19.  The student body rejected the proposed budget by majority vote on September 21, 2007.  Defs.' State. Genuine Issues, ¶ 30 (Aug. 15, 2008).

      The SBA Executive Board convened a second budget meeting on September 27, 2007, at which time it voted to exclude CLS-UM and made other funding allocation changes.  Pls.' S.U.F. ¶¶ 91, 94; Defs.' S.G.I. ¶¶ 36; 40.  The SBA Executive Board submitted the second proposed budget to the student body by way of an e-mail in which it cited the SBA Bylaws' open-membership and non-discrimination provisions and explained that CLS-UM had been excluded because it did not meet the criteria outlined therein.  Compl. Ex. L.  The student body approved the second proposed

budget by majority vote on September 28, 2007.  Defs.' S.G.I. ¶
41.

Approximately two weeks later, counsel for CLS-UM sent a
letter asking that Dean E. Edwin Eck reverse the SBA Executive
Board's decision and restore the group "to its status as a
recognized student organization with all of the rights, benefits,
and privileges of that status."  Compl. Ex. N.   Dean Eck
effectively denied CLS-UM's request, explaining in a November 13,
2007, letter that he would leave the second budget in place.
Compl. Ex. O, p. 5. While Dean Eck upheld the budget as approved
by the student body, he advised CLS-UM that it would be allowed
to "use the School of Law Facility and School of Law services,
including access to channels of communication with students such
as the law school website and appropriate bulletin boards."
Compl. Ex. O, p. 4.  CLS-UM is thus treated like all other
student groups at the School of Law except that it was not SBA-
funded during the 2007-2008 academic year.  Eck Decl. ¶ 11.

On December 14, 2007, CLS-UM and its parent organization
commenced this action for declarative and injunctive relief
against Dean Eck in his official capacity, Margaret A. Tonon in
her official capacity as Director for Student Affairs, and the
members of the SBA Executive Board (collectively "Defendants").
CLS-UM and CLS (collectively "Plaintiffs") assert several First
Amendment claims.  Specifically, Plaintiffs allege that
Defendants violated their First Amendment rights to free speech,

expressive association, and free exercise of religion "[b]y revoking CLS-UM's status as a registered student organization and the rights, benefits, and privileges attendant thereto, on the basis of CLS-UM's membership and leadership policies."  Compl. ¶¶ 5.2; 6.2; 7.2.  Plaintiffs also claim that Defendants impermissibly infringed on their free speech rights "[b]y employing a system to recognize and distribute student activities fees to student organizations without sufficient safeguards to prevent viewpoint discrimination against student groups and by providing unbridled discretion to the SBA and the student body to approve or deny budget allocations to student groups."  Compl. ¶ 6.3.

Defendants have moved pursuant to Fed. R. Civ. P. 12(b) to dismiss for lack of subject-matter jurisdiction and failure to state a claim for relief.  Specifically, Margaret Tonon (Tonon) and the Members of the Executive Board (the Board Members) have moved under Fed. R. Civ. P. 12(b)(1) to dismiss all of Plaintiffs' First Amendment claims for lack of subject matter jurisdiction based on lack of standing and, alternatively, Eleventh Amendment immunity.  The Board Members have also moved under Fed. R. Civ. P. 12(b)(6) to dismiss for failure to state a claim on the ground that they are not state actors for purposes of 42 U.S.C. § 1983.

Dean Eck has in turn moved under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' complaint for failure to state a claim, and in doing so urges this Court to follow the lead set by a fellow district court addressing similar claims in *Christian Legal Society Chapter of University of California, Hastings College of Law v. Kane*, 2006 WL 997217 (N.D. Calif. 2006).  Plaintiffs have cross-moved for summary judgment, asking that this Court instead apply the Seventh Circuit's reasoning in *Christian Legal Society v. Walker*, 453 F.3d 853 (7th Cir. 2006) and hold that Defendants have violated Plaintiffs' First Amendment rights to free speech, expressive association, and religious exercise.

Because they are dispositive of this litigation in its entirety, the Court turns first to Dean Eck's motion to dismiss[1] and the Plaintiffs' cross-motion for summary judgment – both of which address the merits of Plaintiffs' First Amendment claims.

## II.  Legal Standards

### A.  Standards Governing Rule 12(b)(6) Motions to Dismiss

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim "tests the legal sufficiency of the claims asserted in the complaint."  *Friedman v. 24 Hour Fitness*

---

[1] Technically, Tonon and the Board Members have not moved to dismiss for failure to state a claim under Rule 12(b)(6).  If Plaintiffs have failed to state legally viable First Amendment claims against Dean Eck, however, their identical claims against Tonon and the Board Members would fail as a matter of law for the same reasons.

*USA, Inc.*, — F.Supp.2d —, 2008 WL 4370005 * 3 (C.D.Cal. Sept. 22, 2008).  To withstand such a motion, "the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Lazy Y Ranch Ltd. v. Behrens*, — F.3d —, 2008 WL 4368216 *6 (9th Cir. Sept. 26, 2008)(*quoting Bell Atl. Corp. v. Twombly*, — U.S. —, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)).  While the plaintiff need not include detailed factual allegations, the complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 127 S.Ct. at 1964.  In determining whether the plaintiff has satisfied this burden, the court accepts "all facts alleged in the complaint as true," as well as reasonable inferences to be drawn from them, and "constru[es] them in the light most favorable to the plaintiff." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004).  However, the court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Cholla Ready Mix*, 382 F.3d at 973.

In general, the court's inquiry on a Rule 12(b)(6) motion is limited to the "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leashold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1096 (9th Cir. 2008).  The court "need not accept as true [any] allegations contradicting documents that are referenced in the complaint."

*Lazy Y Ranch*, 2008 WL 4368216 *6.  Nor is the court required to
"assume the truth of legal conclusions merely because they are
cast in the form of factual allegations."  *Warren v. Fox Family
Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).  Moreover,
the court may consider "documents attached to the complaint,
documents incorporated by reference in the complaint, or matters
of judicial notice without converting the motion to dismiss into
a motion for summary judgment."  *United States v. Ritchie*, 342
F.3d 903, 908 (9th Cir. 2003).

Defendants clearly expect that this case is to be resolved
on the pending motions, and cite *Keams v. Tempe Tech. Inst.,
Inc.*, 110 F.3d 44, 46 (9th Cir. 1996) for the proposition that
the Court is to treat a Rule 12(b)(6) motion as one for summary
judgment if matters outside the pleadings are considered.  It is
within this Court's "discretion to accept and consider extrinsic
materials offered in connection with [a Rule 12(b)(6) motion] and
convert the motion to one for summary judgment when a party has
notice that the district court may look beyond the pleadings."
*Hamilton Materials, Inc. v. Dow Chemical Corp.*, 494 F.3d 1203,
1207 (9th Cir. 2007).  Defendants expect that this Court will
look to the extrinsic materials of record in resolving the
pending motions.  While many of these materials are appended to
Plaintiffs' Complaint, both parties have submitted other
extrinsic materials that the Court may not consider without first
converting Defendants' motion to one for summary judgment.  As
Defendants anticipate, their Rule 12(b)(6) motion to dismiss

should be converted to one for summary judgment and this Court
will proceed accordingly.

    B.  Standards Governing Summary Judgment Motions

    A party moving for summary judgment bears the burden of
demonstrating "that there is no genuine issue as to any material
fact and that the moving party is entitled to a judgment as a
matter of law." Fed. R. Civ. P. 56(c).  A movant may satisfy
that burden where the documentary evidence produced by the
parties permits only one conclusion. *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 251 (1986).

    The party seeking summary judgment bears the initial burden
of informing the Court of the basis for its motion, and
identifying those portions of the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, which it believes demonstrate the absence of
any genuine issue of material fact. *Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986).  Where the moving party has met its
initial burden with a properly supported motion, the party
opposing the motion "may not rest upon the mere allegations or
denials of his pleading, but . . . must set forth specific facts
showing that there is a genuine issue for trial." *Anderson*, 477
U.S. at 248.

    The Court's role under Rule 56 is not to weigh the evidence
or find the facts, but is limited to determining whether any
genuine issue exists as to any material fact that would require a
trial. *See Anderson*, 477 U.S. at 249.  In making this

determination the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255.

When presented with cross-motions for summary judgment, the Court must "evaluate each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *ACLU v. City of Law Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003) cert. denied 540 U.S. 1110 (2004).

## III.  Cross-Motions for Summary Judgment

Plaintiffs claim that Defendants violated their First Amendment rights to free speech, expressive association, and free exercise by refusing to recognize CLS-UM as a student organization and correspondingly depriving CLS-UM of the "rights, benefits, and privileges" to which such organizations are typically entitled.

Plaintiffs' free speech claim has two components.  First, Plaintiffs advance what amounts to a facial challenge to the system by which the Defendants allocate SBA funding.  Plaintiffs claim that "the SBA Executive Board exercises unbridled discretion in allocating student group funding" and improperly relies on a majoritarian vote of the student body for purposes of ratifying those budget allocations.  Second, Plaintiffs challenge the recognition and fee allocation system as applied here. According to Plaintiffs, Defendants exercised their unbridled discretion in refusing to recognize and fund CLS-UM as a student

organization, and in doing so engaged in impermissible viewpoint
discrimination.

Plaintiffs also claim that Defendants have infringed on
their First Amendment right to expressive association by
effectively requiring as a precondition to recognition and
funding that CLS-UM open its voting membership and officer
positions to those who do not adhere to the group's religious
viewpoints.  Finally, Plaintiffs maintain that Defendants singled
CLS-UM out for unfavorable treatment because of its religious
beliefs regarding sexual morality, thereby violating Plaintiffs'
free exercise rights.

A.  Freedom of Speech

1.  *Facial Challenge*

Plaintiffs argue that Defendants have unbridled discretion
when it comes to recognizing student organizations and allocating
funds to those groups.  Plaintiffs claim that without any
safeguards for viewpoint neutrality, the Defendants' system for
recognizing student groups and allocating funds fosters viewpoint
discrimination in violation of the First Amendment's free speech
guarantees.

Plaintiffs in a facial constitutional challenge bear a
"heavy burden" in advancing their claim.  *Amidon v. Student
Association of the State University of New York*, 508 F.3d 94, 98
(2d Cir. 2007) (*quoting National Endowment for the Arts v.
Finley*, 524 U.S. 569, 580 (1998)).  "To prevail, plaintiffs must
'demonstrate a substantial risk' that application of the

challenged practice or provision will lead to a First Amendment violation." *Amidon*, 508 F.3d at 98 (*quoting NEA*, 524 U.S. at 580)).

Plaintiffs maintain that the system by which Defendants decide which student groups are eligible to receive funding, and how to then allocate that funding between groups, is facially invalid because it gives the Defendants unbridled discretion to make those determinations, thereby fostering viewpoint discrimination in violation of the First Amendment's free speech guarantees.  Speaking first to the threshold question of *eligibility* for funding, Plaintiffs argue that the system by which Defendants recognize student groups does not have enough "safeguards to prevent viewpoint discrimination."  Compl. ¶ 6.3.

Only SBA recognized independent student organizations are eligible to receive SBA funds. Compl. Ex. D, pp. 3, 11 (SBA Bylaws art. III, § 5, art. X, § 2).  Plaintiffs maintain that the Defendants proceeded with unbridled discretion in determining whether to recognize CLS-UM as a student organization and ultimately denied the group recognition because of its religious viewpoints.

But the SBA Bylaws do establish criteria for recognition as a group eligible to receive funding, providing in part that to be recognized as an independent student organization "a student group must have a faculty advisor, have Bylaws on file with the School of Law administration and SBA Executive board, meet regularly, and be open to all members of the School of Law."

Compl. Ex. D p. 11 (SBA Bylaws art. X, § 2).  Reading these
criteria as part of the SBA Bylaws as a whole, Article IV, § 10
provides additional guidance, stating that all "[s]tudents have
the right to be free from discrimination, harassment, or
intimidation based upon actual or perceived: age, sex,
nationality, creed, religion, color, race, sexual orientation,
gender identity and expression, disability, familial status,
military service, or other purely arbitrary criteria."

These open-membership and non-discrimination standards
provide guidance to the Defendants tasked with deciding whether
to recognize student groups as eligible to receive SBA funding.
The criteria set forth therein are viewpoint neutral and do not
target the content of any student group's beliefs.  *See Kane*,
2006 WL 997217 *12; *Roberts*, 468 U.S. at 615. The SBA Bylaws
sufficiently limit the Defendants' discretion so as to satisfy
the First Amendment's viewpoint neutrality requirement.

Turning next to the *allocation* of SBA funding among those
groups recognized by Defendants as eligible recipients,
Plaintiffs claim that the fee allocation system does not satisfy
the First Amendment's prohibition against viewpoint
discrimination because Defendants have unbridled discretion to
make those funding decisions.

Speaking to this general issue, the United States Supreme
Court has indicated that "[w]hen a university requires its
students to pay fees to support the extracurricular speech of
other students, all in the interest of open discussion, it may

not prefer some viewpoints to others" and must allocate those funds in a viewpoint neutral way. *Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 233 (2000) (*Southworth I*). This "requirement of viewpoint neutrality includes as a corollary a prohibition on unbridled discretion." *Southworth v. Board of Regents of the University of Wisconsin System*, 307 F.3d 566, 579-80 (7th Cir. 2002) (*Southworth II*). In other words, "[t]he requirement of viewpoint neutrality includes a mandate that a decisionmaker not possess unbridled discretion." *Southworth II*, 307 F.3d at 595.

Illustrating the propriety of applying the unbridled discretion standard to such a mandatory fee system, the *Southworth II* court explained that "if the student government lacks specific and concrete standards to guide its funding decisions, it could use its unbridled discretion to discriminate on the basis of viewpoint," and "that viewpoint discrimination would go unnoticed because without standards there is no way of proving that the decision was unconstitutionally motivated." *Southworth II*, 307 F.3d at 580.

Applying these principles, the Second Circuit held in *Amidon v. Student Association of the State University of New York at Albany*, 508 F.3d 94, 95 (2d Cir. 2007), that a university's student association "violated the First Amendment by using an advisory student referendum to determine how to allocate funds from a mandatory student activity fee among student organizations." According to the *Amidon* court, use of a student

Page 16

referendum reflecting the student body's majority opinion has "no place in the funding allocation process, which requires that 'minority views [be] treated with the same respect as majority views.'" *Amidon*, 508 F.3d at 102 (*quoting Southworth I*, 529 U.S. at 235).

Analogizing to the foregoing cases, Plaintiffs argue that the Defendants' system for allocating SBA funds to student organizations is unconstitutional because it does not sufficiently safeguard against viewpoint discrimination.  In Plaintiffs' view, the funding allocation system is deficient because "there are no written, definite, and objective criteria to guide the SBA Executive Board in allocating student activity fees."

The record indeed reflects that the SBA Executive Board likely composed its initial proposed budget, which would have allocated funds to CLS-UM and a number of other student organizations, without the benefit of any specific written criteria.  Defendants do not point to any written criteria by which the SBA Executive Board was to make its funding allocation decisions, and review of the record reveals none.  As the *Amidon* and *Southworth* courts have instructed, the absence of such objective criteria is problematic from a constitutional standpoint.

Plaintiffs also complain that when the SBA Executive Board submitted its second proposed budget, in which it eliminated any funding allocation for CLS-UM, the criteria on which the board

claimed to have relied were not in fact viewpoint neutral.  When the SBA Executive Board submitted the second proposed budget to the student body on September 28, 2007, it explained that it had "considered objective criteria in order to disperse new funds as consistently as possible."  Compl. Ex. L.  That "non-exhaustive list" of criteria included "community involvement, contribution to the law school through consistent educational events, size of membership, articulated plans for the upcoming year, self sufficiency, and collaboration."  Compl. Ex. L.  As Plaintiffs point out, however, criteria such as the size of a group's membership and popularity of a group's events are not necessarily viewpoint neutral, and the fact that the criteria are nonexclusive means "there is a disconcerting risk that the [student association] could camouflage its discriminatory use of the referenda through post-hoc reliance on unspecified criteria." *Amidon*, 508 F.3d at 104; *see also Southworth* II, 307 F.3d at 594-95.

Finally, Plaintiffs contend that "[t]he Defendants' submission of fee allocations to a student body vote also fosters viewpoint discrimination."  Pls.' Br. in Support 8 (July 28, 2008).  The Defendants' practice of submitting the SBA Executive Board's proposed budget to the student body for a ratification vote, binding or otherwise, is very much akin to the advisory referendum rejected by the *Amidon* court as problematic because of the potential for impermissible viewpoint discrimination. *Amidon*, 508 F.3d at 106; *see also Southworth I,* 529 U.S. at 235.

For all of the above reasons, Plaintiffs have legitimate and possibly well-taken concerns regarding the constitutionality of the Defendants' funding allocation system.  That having been said, however, Plaintiffs' claim, as it pertains to funding allocation, fails as a matter of law because they were not eligible to be considered for SBA funding in the first place.

Plaintiffs argue otherwise, citing *Southworth I* and *Southworth II* for the proposition that CLS-UM's individual members have standing to challenge the viewpoint discriminatory distribution of their student activity fees regardless of whether CLS-UM is eligible to receive funding.  Pls.' Reply 2.  The *Southworth* courts indeed recognized that individual students who paid mandatory student activity fees had standing to challenge the system by which those fees were allocated because they had an "alleged concrete and particularized interest" in having "their mandatory student activity fees []distributed in a viewpoint neutral manner."  *Southworth II*, 307 F.3d at 573.  In light of that interest, "the objecting students [were entitled] to insist upon certain safeguards with respect to the expressive activities which they are required to support."  *Southworth II*, 307 F.3d at 573 (*quoting Southworth I*, 529 U.S. at 229).

The defending university in *Southworth* did not dispute that the plaintiffs had thus satisfied the "injury-in-fact" requirement of standing, but nevertheless maintained standing was lacking because the plaintiffs did not allege "specific acts of viewpoint discrimination."  *Southworth II*, 307 F.3d at 574.  But

because the students' challenge was a facial one, rather than an as-applied challenge, the court concluded they did not have to allege any actual incidents of viewpoint discrimination to have standing. *Southworth II*, 307 F.3d at 574-75; 581. Analogizing to licensing and permit cases, the *Southworth II* court held that the plaintiff students had "standing to present a facial challenge to the University's mandatory fee system without applying for, or being denied, funding." *Southworth II.*

The difference in this case is that Plaintiffs have not suffered from a comparable injury in fact. In *Southworth*, plaintiffs were students who had paid mandatory activity fees and thus had an "independent First Amendment right not be compelled to support non-governmental speech with which they disagree, where the system for distributing funding discriminates against other student groups...on the basis of viewpoint." *Southworth II*, 307 F.3d at 573-74. In this case, the Plaintiffs not individual students who have paid a mandatory fee. Therefore, without first demonstrating that they were in fact eligible to receive funds, neither CLS nor CLS-UM can show that they had a separately protected interest in how those funds are allocated. Plaintiffs' challenge is more properly asserted as one to the Defendants' decision finding CLS-UM ineligible for SBA funding. Plaintiffs indeed mount such an as-applied challenge, alleging that Defendants applied the SBA Bylaws' open membership and non-discriminatory provisions in a viewpoint discriminatory manner.

2.        *Violation of Open Membership and Non-*
          *Discrimination Policies*

Before turning to the substance of Plaintiffs' as-applied
challenge, the Court considers Plaintiffs' argument that their
membership requirements do not in fact implicate Defendants' open
membership and non-discrimination policies.  Notwithstanding
Plaintiffs' argument to the contrary, it is apparent from the
terms of the Statement of Faith and Sexual Morality Standards to
which all CLS-UM members and officers are bound that the group's
membership requirements violate the Defendants' non-
discrimination policy by discriminating based on two equally
impermissible grounds – religion and sexual orientation.

It is undisputed that all CLS-UM members and officers must
sign and affirm the following Statement of Faith:

Trusting in Jesus Christ as my Savior, I believe in:

> * One God, eternally existent in three persons, Father
> Son and Holy Spirit.
> * God the Father Almighty, Maker of heaven and earth.
> * The Deity of our Lord, Jesus Christ, God's only Son
> conceived of the Holy Spirit, born of the virgin Mary;
> His vicarious death for our sins through which we
> receive eternal life; His bodily resurrection and
> personal return.
> * The presence and power of the Holy Spirit in the work
> of regeneration.
> * The Bible as the inspired Word of God.

Compl. Ex. B.

All CLS-UM members and officers must agree to and affirm
this Statement of Faith as interpreted by the group's Sexual
Morality Standards.  Those standards detail some of the group's
religious tenets, explaining for example that the "fifth

paragraph of the Statement of Faith, in acknowledging the Bible as 'the inspired Word of God,' affirms that the Holy Scripture is the revelation of the will of God to man, and the ultimate source of authority for faith and life." Compl. Ex. C.  Speaking directly to the issues of sexual morality, these standards characterize "all acts of sexual conduct outside of God's design for marriage between one man and one woman" as sinful, including "homosexual conduct."  Compl. Ex. C.  CLS-UM members and officer are to refrain from "unrepentant participation in or advocacy of [such] a sexually immoral lifestyle." Compl. Ex. C.

By requiring its members and officers to affirm the foregoing Statement of Faith and Sexual Morality Standards, CLS-UM discriminates based on religion, in violation of the plain language of the Defendants' non-discrimination policy.  A non-Christian cannot in good faith affirm Jesus Christ as his savior and similarly avow belief in the five principles enumerated in CLS-UM's Statement of Faith.  *See Truth v. Kent School Dist.*, 542 F.3d 634, 644-45 (9th Cir. 2008) (concluding that a Christian group's "requirement that members possess a 'true desire to...grow in a relationship with Jesus Christ' inherently excludes non-Christians" and thereby violated the school district's policies prohibiting discrimination based on religion).  Because a non-Christian could not possibly become a CLS-UM member or officer in light of these requirements, CLS-UM's

membership policies certainly violate the Defendants' non-discrimination policy by discriminating based on religion.[2]

In addition to discriminating against potential members and officers based on religion, CLS-UM's requirements also discriminate against potential members and officers based on their sexual orientation.  In an effort to establish otherwise, Plaintiffs claim their membership requirements are concerned not with sexual orientation, but with religious beliefs concerning extramarital sexual conduct and actions inconsistent with those beliefs.  In other words, Plaintiffs take the position that their membership requirements target sexual conduct, not sexual orientation, and apply equally to heterosexuals.  To support this interpretation, Plaintiffs cite *Walker,* 453 F.3d at 858, in which the Seventh Circuit indeed found that while "CLS requires its members and officers to adhere to and conduct themselves in accordance with a belief system regarding standards of sexual *conduct*," the group's "membership requirements do not exclude members on the basis of sexual *orientation*."  *Walker*, 453 F.3d at 860.  Because heterosexuals who engage in unmarried heterosexual conduct without repenting could likewise be excluded from membership, the court concluded that CLS's membership policies

---

[2]   Although the parties focus in briefing on CLS-UM's membership requirements as they pertain to sexual orientation, when the SBA Executive Board submitted the second proposed budget to the student body for a ratification vote, it did so on the stated basis CLS-UM "does not currently meet the criteria outlined in the SBA Bylaws."  While the board cited the law school's non-discrimination policy, it did not specify whether it was of the view that CLS-UM discriminated based on religion, sexual orientation, or both.

were "based on belief and behavior, rather than status." *Walker*,
453 F.3d at 861.

As the *Kane* court found when rejecting the same argument
however, "this is a distinction without a difference." *Kane*,
2006 WL 997217 *7 n.2.  In so concluding, *Kane* relied in part on
Justice O'Connor's concurring opinion in *Lawrence v. Texas*, 539
U.S. 558, 583 (2003), which rejected an attempt to distinguish a
statute discriminating against "homosexual conduct" from one
discriminating on the basis of sexual orientation.  *Kane*, 2006 WL
997217 *7 n.2.  In the words of the Ninth Circuit, there is "no
appreciable difference between an individual ...being persecuted
for being a homosexual and being persecuted for engaging in
homosexual acts."  *Kane*, 2006 WL 997217 *7 n.2 (*quoting Karouni
v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005)).

The *Kane* court's logic is more compelling than that of the
*Walker* court.  CLS-UM's Sexual Morality Standards not only
proscribe homosexual conduct, but also require that the group's
members and officers refrain from unrepentant "advocacy of a
sexually immoral lifestyle," which is defined as including a
homosexual lifestyle.  Requiring a homosexual to not only refrain
from engaging in homosexual conduct but to also repent of his or
her sexual identity is not meaningfully different from excluding
homosexuals from membership.  Because CLS's membership policies
effectively exclude openly homosexual individuals, those policies
discriminate based on sexual orientation.

Because they discriminate based on religion and sexual orientation, CLS's membership policies are in conflict with the law school's open membership and non-discrimination policies. It is with this in mind that the Court turns now to the merits of Plaintiffs' free speech viewpoint discrimination claim.

### 3.  As-Applied Challenge

Plaintiffs argue that Defendants denied CLS-UM the benefits of recognition based on the group's religious views concerning sexual morality and in doing so engaged in religious viewpoint discrimination of the sort condemned by the United States Supreme Court in *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995) and *Widmar v. Vincent*, 454 U.S. 263 (1981). Pls.' Br. in Support, 4.

In *Rosenberger*, the Supreme Court held that a state university had engaged in impermissible viewpoint discrimination when it denied funding to a student group that published a newspaper with a religious editorial viewpoint. *Rosenberger*, 515 U.S. at 831. In doing so, the court reiterated the well-established principle "that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. The *Rosenberger* court described viewpoint discrimination as "an egregious form of content discrimination" that occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject" and regulates "speech when the specific motivating ideology or the opinion or perspective of the speaker

is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.  Because the university in that case had clearly denied funding for the group's publication based on its religious viewpoint, the Court held that the university had engaged in viewpoint discrimination. *Rosenberger*, 515 U.S. at 831-32. *See also Widmar*, 454 U.S. at 277 (similarly holding that a public university, having opened its facilities for use by student groups, engaged in viewpoint discrimination by excluding religious student groups from participating in that forum based on the religious content of their speech).

*Widmar* and *Rosenberger* make clear that the Court is to apply a limited public forum analysis when evaluating a university's decision denying a religious student group's request for recognition and funding. *Widmar*, 454 U.S. at 267-78; *Rosenberger*, 515 U.S. at 829. *See also Truth v. Kent School District*, 542 F.3d 634, 648-49 (9th Cir. 2008).  "[T]he government may exclude speech in a 'limited public forum' so long as its reasons for doing so are viewpoint neutral and 'reasonable in light of the purpose served by the forum.'" *Truth*, 542 F.3d at 648 (*quoting Rosenberger*, 515 U.S. at 829).  Applying this standard, the question is whether the Defendants' enforcement of its open membership and non-discrimination policies were viewpoint neutral and reasonable in light of the purposes of the forum.

It is safe to say that the law school's open membership and non-discrimination policies are reasonable in light of the

purposes of the forum.  "[P]art of a school's mission is to instill in students the 'shared values of a civilized social order,' which includes instilling the value of non-discrimination."  *Truth*, 542 F.3d at 648 (*citing Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988)).  And as the *Widmar* court recognized, in light of the fact that "[a] university's mission is education," universities have the "authority to impose reasonable regulations compatible with that mission upon the use of [their] campus[es] and facilit[ies]."  *Widmar*, 454 U.S. at 268 n.5.  Citing *Widmar*, the *Kane* court concluded that a university's "requirement of compliance with its nondiscrimination policy is a reasonable regulation that is consistent with and furthers its educational purpose."  *Kane*, 2006 WL 997217 *14.  This Court agrees.

While this Court is thus satisfied that enforcement of the law school's open membership and non-discrimination policies is reasonable in light of the purposes of the forum, much of the argument in this case centers on whether Defendants enforced those policies in a viewpoint neutral manner.  In Plaintiffs' view, they did not.  According to Plaintiffs, Defendants applied those policies for purposes of the 2007-2008 budget "in a manner that single[d] out certain religious views and prohibit[ed] common association only around those views."  Pls.' Br. in Support, 10.  For support, Plaintiffs point to the fact that other recognized student groups eligible to receive SBA funding limit their voting membership and leadership positions to

students who agree with and promote their respective missions.
Specifically, Plaintiffs point to the fact that both the American
Association of Justice and the Environmental Law Group impose
such limitations, and argue that forbidding religious
organization from using religious criteria in their voting
membership and officer positions constitutes religious viewpoint
discrimination.

Plaintiffs cite *Christian Legal Society v. Walker*, 453 F.3d
853, 866-67 (7th Cir. 2006) and *Truth*, 542 F.3d at 650 for the
proposition that it is religious viewpoint discrimination for a
university to prohibit religious organizations from using
religious criteria in their voting membership and leadership
practices, while allowing other organizations to limit voting
membership and leadership positions to those that support their
mission and objectives.  Pls.' Br. in Support 11.  As it does
here, CLS alleged in *Walker* that the defendant law school
violated the group's First Amendment rights by revoking its
recognized status on the basis that "CLS's membership policies,
which preclude membership to those who engage in or affirm
homosexual conduct, violate[d] [the school's] nondiscrimination
policies."  *Walker*, 453 F.3d at 857.  Analyzing the group's free
speech viewpoint discrimination claim, the *Walker* court observed
that while the school's policy was "viewpoint neutral on its
face," there was "strong evidence that the policy had not been
applied in a viewpoint neutral way."  *Walker*, 453 F.3d at 866.
That evidence indicated that CLS had been the only group stripped

of recognized status for failing to comply with the law school's nondiscrimination policy, even while "other recognized student organizations discriminate[d] in their membership requirements on grounds prohibited by [the law school's] policy." *Walker*, 453 F.3d at 866.  Not surprisingly, the court found this evidence suggested that the school had not applied its nondiscrimination policy in a viewpoint neutral manner.

The Ninth Circuit applied similar logic in the *Truth* case, where the defendant school district refused to recognize a Christian student group on the ground that its selective membership criteria violated the district's non-discrimination policies.  As did the plaintiff in *Walker*, the plaintiff in *Truth* presented evidence that other student groups had been granted official recognition despite violating the district's non-discrimination policy.  *Truth*, 542 F.3d at 650.  In light of that evidence, the court held that "to the extent [the plaintiff] argue[d] it was denied an *exemption* from the non-discrimination policy based on the content of its speech," the group had "raised a triable issue of fact."  *Truth*, 542 F.3d at 650.

Unlike the plaintiffs in *Truth* and *Walker*, Plaintiffs in this case have not pointed to any evidence indicating that the law school has selectively applied its policies against CLS-UM and allowed other student groups to discriminate in their membership requirements on grounds prohibited by the SBA Bylaws. While certain student groups may require that their members support specific causes, such as environmental awareness, doing

so does not violate the school's non-discrimination policy.  *See Truth*, 542 F.3d at 647.  To the extent Plaintiffs argue such membership requirements violate the school's so-called open membership provision, they are likewise mistaken.  Article X, § 2 of the SBA Bylaws provides, in part, that a student organization must "be open to all members of the School of Law" in order to be eligible for SBA funding.  This extremely broad provision must be read in conjunction with school's non-discrimination policy, which in turn identifies the grounds upon which a group may not discriminate in its membership requirements.  To read the open membership provisions as broadly as Plaintiffs' apparently suggest would lead to an absurd result, pursuant to which a student group would not be able to exclude students from membership and leadership positions for failure to pay dues or other rules violations.

Finally, Plaintiffs take the position that the Defendants engaged in viewpoint discrimination by first recognizing CLS-UM as a student group eligible to receive funding, and then revoking that status in response to the student body's vote.  As Plaintiffs note, when the SBA Executive Board submitted its first proposed budget, CLS-UM was included as a group eligible to receive funding.  But when the SBA Executive Board submitted its second proposed budget after the first one was rejected by the student body, it eliminated CLS-UM on the grounds that the group did not comply with the school's non-discrimination policy. Plaintiffs suggest Defendants changed their position on the issue

of recognition and funding not because they truly believed CLS-UM's membership and leadership requirements violated the school's non-discrimination policy, but because they simply disapproved of the group's religious views concerning sexual morality and were "hunting for a basis to exclude CLS-UM amid majoritarian pressure to do so."  Pls.' Br. in Supp. 10.

Defendants offer a contrary explanation, pointing to evidence suggesting that the SBA Executive Board did not have complete information regarding CLS-UM's bylaws at the time it composed the first proposed budget. Defendants maintain that the Board eliminated CLS-UM from the second proposed budget not in reaction to the student body vote, but because it learned that CLS-UM would require its members and officers to the sign the Statement of Faith and in doing so violate the school's non-discrimination policy.

Regardless of exactly how the events surrounding the 2007-2008 SBA budget transpired, it is significant that Plaintiffs seek only prospective relief.  That this is an action "for prospective relief" is clear from the briefing, in which Plaintiffs use that very phrase to describe this litigation, and from the face of the Complaint.  Pls.' Reply in Support of Mot. for S.J. 3 (Aug. 26, 2008).  Plaintiffs ask the Court for a declaration that Defendants' decision denying recognition violates the United States Constitution and seek "[a] permanent injunction enjoining Defendants from denying to CLS-UM recognized

student organization status on the basis of CLS-UM's policies"
and from withholding associated benefits.  Compl. p. 20.

Regardless of why Defendants chose to enforce the non-
discrimination policy against CLS-UM during the funding process
for the 2007-2008 academic year, Plaintiffs have not provided a
basis for preventing Defendants from enforcing that policy now
and into the future.  Unlike *Truth*, there is no evidence of
ongoing selective enforcement in this case because there is
nothing to suggest that Defendants enforced the non-
discrimination policy against CLS-UM all the while exempting
other non-complying student groups.  The only arguable basis for
CLS-UM's viewpoint discrimination claim is that Defendants acted
with an improper motive when they eliminated CLS-UM from the
second proposed budget for the 2007-2008 school year.  With the
exception of the $200 in funding it would have received had the
first proposed budget been approved, CLS-UM otherwise enjoyed
every benefit of recognition during the 2007-2008 academic year
and does so to this day.  Absent some evidence of ongoing
viewpoint discrimination, such as the granting of exemptions to
other non-complying student groups, there is no basis for forever
and indefinitely precluding Defendants from enforcing their non-
discrimination policy against CLS-UM, which is the relief sought
in the Complaint.

In sum, the Defendants' decision to condition recognition
and funding on compliance with the school's open membership and
non-discrimination policies was reasonable in light of the

purposes of the forum and accomplished in a viewpoint neutral manner consistent with the First Amendment's free speech guarantees.  For all of the above reasons, Defendants' enforcement of their open membership and non-discrimination policies did not infringe on Plaintiffs' right to free speech as guaranteed by the First Amendment.

B.  Expressive Association

Plaintiffs also claim that Defendants have violated their First Amendment right of expressive association.  As set forth in their Complaint, Plaintiffs allege that by revoking CLS-UM's "status as a registered student organization and rights, benefits, and privileges attendant thereto, on the basis of CLS-UM's membership and leadership policies, defendants have violated and will continue to violate the right to freedom of expressive association" guaranteed by the First Amendment.  Compl. ¶ 5.2.

Implicit in the First Amendment is "the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622.  "Government action may impermissibly burden the freedom to association in a variety of ways," including "'impos[ing] penalties or withold[ing] benefits from individuals because of their membership in a disfavored group' and 'interfer[ing] with the internal organization or affairs of the group.'" *Walker*, 453 F.3d at 861 (*quoting Roberts*, 468 U.S. at 6123).

1.  *Conditioned Inclusion*

As a threshold matter, the parties have a difference of opinion as to the legal framework under which this Court is to evaluate Plaintiffs' claim.  Plaintiffs characterize this case as one of "forced inclusion," and ask this Court to follow the United States Supreme Court's leading forced inclusion cases, *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995).

Defendants disagree with Plaintiffs' characterization, and maintain that the practical effect of their decision to withhold recognition and funding does not rise to the level of the forced inclusion at issue in *Dale* and *Hurley*.  In Defendants' view, this case is more akin to those involving denial of access to a nonpublic forum or denial of a government benefit.  *See Boy Scouts of America v. Wyman*, 335 F.3d 80, 92 (2d Cir. 2003). Under this line of cases, Defendants' decision to withhold funding is constitutional if the grounds for the denial are viewpoint neutral and reasonable.  *Wyman*, 335 F.3d at 92.

The Supreme Court's forced inclusion cases address the validity of essentially forcing a private group to accept members with whom the group does not want to associate.  In *Hurley*, for example, the Supreme Court held that a state could not require that parade organizers allow a gay rights organization to march in a parade.  *Hurley*, 515 U.S. at 568.  The court reasoned that "when dissemination of a view contrary to one's own if forced upon a speaker intimately connected with the communication

Page 34

advanced, the speaker's right to autonomy over the message is compromised." *Hurley*, 535 U.S. at 576.  In *Dale,* the Supreme Court similarly held that a state anti-discrimination statute, which required the Boy Scouts to accept a homosexual as a scoutmaster, infringed on the group's freedom of expressive association.  *Dale*, 530 U.S. at 656.  The *Dale* court found that the presence of an avowed homosexual and gay rights activist as an assistant scoutmaster would surely interfere with the Boy Scouts' "desire to not promote homosexual conduct as a legitimate form of behavior."  *Dale*, 530 U.S. at 653-54.

The circumstances in this case are very different.  Unlike *Dale* and *Hurley*, Defendants are not forcing a private organization to accept members with whom the group does not wish to associate.  To the contrary, Defendants have simply conditioned receipt of the benefit of funds on compliance with school's open-membership and non-discrimination policies.  *See Kane*, 2006 WL 997217 *16.  With the exception of SBA funding, CLS-UM enjoys every other benefit of recognition.  CLS-UM is allowed to meet using the law school's facilities and has access to channels of communication with students, including the law school's website and bulletin boards.  Defs. SGI ¶ 44; Compl. Ex. O.  Because CLS-UM enjoys every benefit of formal recognition except SBA funding, the practical effect of Defendants' decision does not rise to the level of unconstitutional forced inclusion.

Instead, the situation at hand more closely resembles that present in *Wyman*, where a state committee precluded the Boy

Scouts from participating in a state employee charitable campaign on the basis that the group policy of excluding homosexuals from membership and employment positions violated the state's Gay Rights Law. *Wyman*, 335 F.3d at 84. The Boy Scouts brought suit, alleging violations of their right of expressive association. *Wyman*, 335 F.3d at 84. The court distinguished *Dale*, and determined that the effect of the state's decision was "neither direct nor immediate, since its conditioned exclusion d[id] not rise to the level of compulsion." *Wyman*, 335 F.3d at 91. Regardless of whether the Boy Scouts' exclusion was "viewed as denial of access to a nonpublic forum or as the denial of a government benefit," the court indicated the state's decision was constitutional "only if it was (1) viewpoint neutral and (2) reasonable." *Wyman*, 335 F.3d at 92.

The court held that both of these elements were satisfied. Because the purpose of the state's Gay Rights Law was "to discourage harmful conduct and not to suppress expressive association," the court held "that the law as enacted [was] viewpoint neutral." *Wyman*, 335 F.3d at 95. The court also rejected the Boy Scouts' argument that the state's application of the statute was viewpoint discriminatory, noting the absence of anything other than the speculative argument to that effect. *Wyman*, 335 F.3d at 95-96. On the issue of reasonableness, the court concluded that the committee's decision was a reasonable means of furthering the state's "legitimate interest in preventing conduct that discriminates on the basis of sexual

orientation." *Wyman*, 335 F.3d at 98.  Because the Boy Scouts had not presented any evidence of viewpoint discrimination, and because it was reasonable for the state to exclude the group from the campaign, the court held that defendants were entitled to judgment as a matter of law.  *Wyman*, 335 F.3d at 98.

Here, as in *Wyman*, the Defendants' non-discrimination policy is viewpoint neutral on its face.  It prohibits discrimination based on certain protected categories, but does "not distinguish between prohibited and permitted activity on the basis of viewpoint." *Roberts*, 468 U.S. at 615.  Nor, as previously discussed, have the Plaintiffs presented any evidence that Defendants' selectively enforced that policy against CLS-UM based on the group's viewpoints regarding religious standards of sexual morality.  And finally, the Defendants' decision to withhold recognition and funding was a reasonable means of furthering the state's "legitimate interest in preventing conduct that discriminates on the basis of sexual orientation." *Wyman*, 335 F.3d at 98.

Plaintiffs urge this Court to reject the conditioned inclusion line of cases represented by *Kane* and *Wyman,* and follow the Seventh Circuit's decision in *Walker* instead.  While the *Walker* court followed the Supreme Court's "forced inclusion" line of cases, it did so under different circumstances and without explaining how the practical effect of the decision to derecognize CLS rose to the level of forced inclusion.  In fact, the practical effect of the group's derecognition in *Walker* was

Page 37

greater than the effect on CLS-UM in this case.  For example, "[a]s a result of the derecognition" in *Walker*, "CLS was no longer able to reserve law school rooms for private meetings." *Walker*, 453 F.3d at 858.  The defendants also denied CLS "access to law school bulletin boards, representation on the law school's website or in its publications, and the liberty to refer to itself as the 'SIU Chapter of' the Christian Legal Society." *Walker*, 453 F.3d at 858.  "Finally, CLS was stripped of an official faculty advisor, free use of the SIU School of Law auditorium, access to the law school's List Serve, and any funds provided to registered student organizations."  *Walker*, 453 F.3d at 858.

With the exception of funding, Defendants in this case have not deprived the Plaintiffs of any of these benefits associated with recognized student organizations.  CLS-UM continues to enjoy every benefit that the law school's recognized groups do, except SBA funding, which Defendants have reasonably conditioned on the group's compliance with the applicable open-membership and non-discrimination policies.  The effect of Defendants' decision to withhold funding does not rise to the level of forced inclusion.

### 2.  *Forced Inclusion*

Even assuming otherwise, and construing this case as one of forced inclusion, the Defendants' decision to condition funding on compliance with their non-discrimination policy withstands constitutional challenge.

Under the United States Supreme Court's forced inclusion line of cases, the following three-part test applies for purposes of determining whether Defendants violated Plaintiffs' right of expressive association: (1) the "organization must engage in expressive association;" (2) the government "action must significantly affect the group's ability to advocate its viewpoints," and (3) the government's interest must justify "the infringement on the right to expressive association." *Kane*, 2006 WL 997217 *20 (*citing Dale*, 530 U.S. at 648-49).

The first of these elements is easily satisfied.  There can be no real dispute that CLS-UM engages in expressive association. The group's stated mission is to "maintain a vibrant Christian Law Fellowship on the School's campus which enables its members, individually, and as a group, to love the Lord with their whole beings – hearts, souls, and minds and to love their neighbor as themselves."  Compl. Ex. B.  In an effort to achieve that mission, CLS-UM has dedicated itself to "[c]ultivating spiritual growth through communal prayer, fellowship, and worship; learning to share one's faith; and devotional study of the Bible and classic Christian works" and "[s]howing the love of Christ to the campus community and the community at large by proclaiming the gospel in word and in deed, such as through a life of integrity and charitable good works."  Compl. Ex. B.  As the *Walker* court put it, "[i]t would be hard to argue...that CLS is not an expressive association."  *Walker*, 453 F.3d at 862.

Assuming that the Defendants' decision conditioning funding on compliance with the school's non-discrimination policy effectively requires CLS-UM to admit homosexual and non-Christian students, the next question is whether that decision would significantly affect the group's ability to express its viewpoints.  *Kane* and *Walker* both addressed this issue, but in doing so reached completely opposite conclusions.  *Kane*, 2006 WL *21-23 (concluding that "requiring CLS to comply with the Nondiscrimination Policy does not significantly affect CLS's ability to advocate its viewpoints); *Walker*, 453 F.3d at 862-63 (concluding "[t]here can be little doubt that requiring CLS to [alter its membership standards] would impair its ability to express disapproval of active homosexuality").  Assuming for purposes of this discussion that the *Walker* court's view is the more persuasive and this second element is thus satisfied, Plaintiffs' claim nevertheless fails under the third prong of the *Dale* test.

The final prong of the *Dale* test directs that the Court consider whether the Defendants' interest in preventing discrimination justifies or outweighs the burden placed on CLS-UM's rights of expressive association.  *Dale*, 530 U.S. at 658-59. In other words, the Court is to balance "the associational interest in freedom of expression...on one side of the scale, and the State's interest on the other."  *Dale*, 530 U.S. at 659.  CLS-UM's freedom of expressive association "may be overridden 'by regulations adopted to serve compelling state interests,

unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Dale*, 530 U.S. at 648 (*quoting Roberts*, 468 U.S. at 623).

The Defendants have a compelling interest in enforcing their non-discrimination policy and eliminating discrimination in the law school whether based on religion, sexual orientation, or some other category. *See Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City University of New York*, 502 F.3d 136, 148 (2d Cir. 2007); *Roberts*, 468 U.S. at 624; *Kane*, 2006 WL 997217 at *24. A policy or statute drawn to eliminate such discrimination "does not aim at the suppression of speech" and "does not distinguish between prohibited and permitted activity on the basis of viewpoint." *Roberts*, 468 U.S. at 623.  As did the public accommodations law at issue in *Roberts*, the non-discrimination policy at issue here serves the Defendants' compelling state interest unrelated to the suppression of ideas.  *Roberts*, 468 U.S. at 624.  The policy is well tailored to achieve that interest, and Plaintiffs do not identify any less restrictive means by which the Defendants could eliminate discrimination.

This is so particularly where, as here, Defendants have enforced the policy in the least restrictive manner possible, allowing CLS-UM all of the associational benefits of recognition with the exception of funding.  This case thus differs from *Walker*, in which the law school's decision derecognizing CLS

infringed on the group's right to expressive association to a far greater extent.  In *Walker*, CLS was not permitted to reserve rooms in the law school for private meetings, was denied access to law school bulletin boards, was denied representation on the law school's website or in its publications, and was not permitted to refer to itself as the university's CLS chapter. *Walker*, 453 F.3d at 858.  In addition, the law school deprived CLS "of an official faculty advisor, free use of the SIU School of Law auditorium, access to the laws school's List Serve, and any funds provided to registered student organizations."  *Walker*, 453 F.3d at 858.

By way of contrast, the Defendants have simply conditioned receipt of SBA funding on compliance with the non-discrimination policy, and have not enforced the policy so as to deprive CLS-UM of the many other benefits stripped away in *Walker*.  In sum, the state has a compelling interest in eliminating discrimination. That compelling interest justifies the limited infringement on CLS-UM's right to expressive association.   Because Defendants' interest in protecting the laws school's students from discrimination justifies any infringement on CLS-UM's ability to express its views, their decision conditioning recognition and associated SBA funding on compliance with the law school's non-discrimination policy does not unconstitutionally infringe CLS-UM's right to expressive association.

C.  Free Exercise

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. 1.  Plaintiffs claim that Defendants have violated this provision by requiring that the group open its voting membership and leadership to individuals who reject its religious beliefs.  In doing so, Plaintiffs maintain that Defendants impermissibly favor some religious beliefs over others because a religious student group with less theologically orthodox views on extramarital sexuality could be recognized.  According to Plaintiffs, such preference or toleration of certain religious beliefs over others is presumptively unconstitutional.

This claim fails for the same reason that Plaintiffs' free speech viewpoint discrimination claim fails.  As discussed above, the open membership and non-discrimination policies do not target specific religious beliefs, but are content neutral.   Such policies "prohibit discrimination on the basis of protected categories, including religion and sexual orientation, irrespective of the motivation for such discrimination."  *Kane*, 2006 WL 997217 *24.  Defendants policies do not differentiate between and among religious beliefs, and Plaintiffs' Free Exercise claim fails accordingly.

As they did in *Kane*, Plaintiffs next cite *Employment Division, Dept. Of Human Resources of Oregon v. Smith*, 494 U.S. 872, 884 (1990), for the proposition that "where government has permitted 'individualized exemptions' from the rule burdening

religion, whether by policy or practice, the law is not neutral
and generally applicable and it thus subject to strict scrutiny."
Pls.' Br. in Support 20.  *See Kane*, 2006 WL 997217 *25.  As the
*Kane* court explained, however, that portion of *Smith* has only
been applied in the unemployment compensation field.  *Kane*, 2006
WL 997217 *25.  Even if this portion of *Smith* did apply,
Plaintiffs have not pointed to any evidence that Defendants
exempted other student organizations from the mandates of the
non-discrimination policy while refusing to the do the same for
CLS-UM.  *Kane*, 2006 WL 997217 *25.

Once again reiterating an argument rejected in *Kane*,
Plaintiffs ask the Court to apply strict scrutiny to their free
exercise claim pursuant to the "hybrid rights" doctrine.  *Kane*,
2006 WL 997217 *26.  The *Kane* court agreed that "*Smith* may be
read to impose strict scrutiny in 'hybrid situation[s]' in which
a law 'involve[s] not the Free Exercise Clause alone, but the
Free Exercise clause in conjunction with other constitutional
protections.'"  *Kane*, 2006 WL 997217 *26 (*quoting Smith*, 494 U.S.
at 881-82).  To assert a "hybrid rights" claim in the Ninth
Circuit, however, "a free exercise plaintiff must make out a
colorable claim that a companion right has been violated – that
is, a fair probability or a likelihood, but not a certitude, of
success on the merits.'" *Kane*, 2006 WL 997217 *26 (*quoting Miller
v. reed*, 176 F.3d 1202, 1207 (9th Cir. 1999)).  *See also*, *Truth*,
542 F.3d at 651 (recognizing "that free exercise claims
implicating other constitutional protections, such as free

Page 44

speech, could qualify for strict scrutiny review" to the extent the plaintiff could make out a colorable claim that it was denied an exemption from the school district's non-discrimination claim based on religion or content of speech).  Because Plaintiffs' free speech claim fails as a matter of law, there is no basis for a "hybrid rights" claim warranting strict scrutiny.

## IV.  **Conclusion**

Based on the foregoing,

IT IS RECOMMENDED that the Defendants' converted Motion for Summary Judgment be GRANTED and the Plaintiffs' Motion for Summary Judgment be DENIED.

IT IS FURTHER RECOMMENDED that the Motion to Dismiss for Lack of Subject Matter Jurisdiction by Tonon and the Board Members be DENIED as MOOT.

NOW, THEREFORE, IT IS ORDERED that the clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate upon the parties.

The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these finding must be filed with the Clerk of Court and copies served on opposing counsel within ten (10) days after receipt hereof, or objection is waived.

DONE and DATED this 14th day of November, 2008.


_____/s/ Jeremiah C. Lynch_____
Jeremiah C. Lynch
United States Magistrate Judge